**Slip Op. 00-107**

# UNITED STATES COURT OF INTERNATIONAL TRADE

_____
:
TA CHEN STAINLESS STEEL PIPE, Inc.,   :
                                      :   Court No. 97-08-01344
        Plaintiff,                    :
                                      :
        v.                            :   Public Version
                                      :
UNITED STATES,                        :
                                      :
        Defendant.                    :
_____:

[Commerce remand determination affirmed.]

                                Dated: August 25, 2000

    Ablondi, Foster, Sobin & Davidow, p.c. (Joel Davidow and Peter Koenig) for plaintiff.

    David W. Ogden, Assistant Attorney General, David M. Cohen, Director, Velta A. Melnbrencis, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (Mark L. Josephs), Cindy G. Buys, Office of the General Counsel, United States Department of Commerce, of counsel, for defendant.

## OPINION

**RESTANI, Judge:** On October 28, 1999, the court remanded the final results of the Department of Commerce, International Trade Administration ("Commerce" or "the Department") in Certain Welded Stainless Steel Pipe from Taiwan, 62 Fed. Reg. 37,543 (Dep't Commerce 1997) (final results of admin. rev.) [hereinafter "Final Results"].  See Ta Chen Stainless Steel Pipe, Ltd. v. United States, No. 97-08-01344, 1999 WL 1001194 (Ct. Int'l Trade Oct. 28, 1999).  Familiarity with the court's earlier opinion is

presumed.

Commerce issued its remand determination on February 25, 2000.  See Final Results of Redetermination Pursuant to Court Remand: Ta Chen Stainless Steel Pipe, Ltd. v. United States, Court No. 97-08-01344 [hereinafter "Remand Results" or "RR"].  Ta Chen contests the Department's application of adverse facts available and selection of the adverse margin in the Remand Results.[1]

**Standard of Review**

In reviewing final determinations in antidumping duty investigations, the court shall hold unlawful any agency determination found unsupported by substantial evidence on the record, or otherwise not in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i) (1994).

**Background**

**A. Ta Chen's Affiliation with Sun Stainless, Inc.**

In the Final Results, Commerce found that Ta Chen was affiliated with one of its U.S. distributors, Sun Stainless, Inc.

---

[1]     Avesta Sheffield Inc., Damascus Tube Division, Damascus-Bishop Tube Co., and United Steelworkers of America (AFL-CIO/CLC), defendant-intervenors as to Ta Chen's Rule 56.2 motion, filed a stipulation of dismissal pursuant to USCIT Rule 41(a)(1)(B) and no longer appear as defendant-intervenors in this case.  See Ta Chen Stainless Steel Pipe, Ltd. v. United States, No. 97-08-01344 (Ct. Int'l Trade Mar. 3, 2000) (stipulation of dismissal).

("Sun"), by virtue of Ta Chen's control over Sun, pursuant to 19 U.S.C. § 1677(33)(G) (1994). Final Results, 62 Fed. Reg. at 37,549-50. Because of Ta Chen's affiliation with this U.S. distributor, Commerce determined that Ta Chen had constructed export price ("CEP") sales during the period of review ("POR"). Because Ta Chen had not provided data on Sun's U.S. sales, the record did not contain the information necessary to calculate CEP. Commerce determined that Ta Chen failed to comply to the best of its ability in providing Sun's U.S. sales information. Id. at 37,552-53. Therefore, Commerce applied partial adverse facts available for Sun's U.S. sales. Id.

The court held that Commerce's determination that Ta Chen controlled Sun was supported by substantial evidence. Ta Chen, 1999 WL 1001194 at *11. The court found, however, that Commerce had failed to provide Ta Chen with sufficient notice of its determination that Ta Chen controlled Sun, and that the Department had never specifically requested the information on Sun's U.S. sales. Id. at *12. Therefore, the court held that Commerce had failed to comply with its statutory obligation under 19 U.S.C. § 1677m(d) (1994) by failing to provide the respondent with notice of a deficient submission before applying facts available. Id. The court remanded the Final Results for Commerce to request Sun's U.S. sales information from Ta Chen.

Id. at *14.

On November 9, 1999, Commerce issued a supplemental questionnaire to Ta Chen requesting information on Sun's U.S. sales in order to calculate CEP. RR at 2. Ta Chen contacted Picol Enterprises, Inc. ("Picol") for this information. Letters (Nov. 30, 1999), at 5, P.R. Doc. 1216, Def.'s Remand App., Tab 4, at 5. Sun's owner, Frank McLane, had sold Sun to Picol International and Masaru Kimura in July 1995. Ta Chen's Response to Petitioner's Comments (Dec. 20, 1996), at 12-14 & Ex. 3, C.R. Doc. 14, Pl.'s Prop. App. to 56.2 motion, Tab B, at 12-14 & Ex. 3. In response to its inquiry, Ta Chen received a letter dated November 25, 1999, from Picol Sun's counsel stating that it would not cooperate with the Department's inquiry because the company had closed on September 30, 1996. Letters, at 6, Def.'s Remand App., Tab 4, at 6. Picol Sun's counsel stated that it no longer maintained any business operations in the United States and that it would be burdensome for Picol Sun to respond to the request. Id. Picol Sun's counsel did state that he would ask his client to reconsider. Id. On November 30, 1999, Ta Chen requested an extension of time in which to provide the Sun information, which the Department granted. RR at 2. On December 7, 1999, Ta Chen requested another extension, but the next day it forwarded the Department a letter from Picol Sun's counsel stating that it

would not respond to the Department's questionnaire for the reasons stated in the November 25, 1999 letter.  Letters (Dec. 8, 1999), at 2, P.R. Doc. 1218, Def.'s Remand App., Tab 7, at 2. Without the information on Sun's U.S. sales, Commerce did not have the information needed to calculate CEP.

Commerce concluded that because Ta Chen had withheld or failed to provide the information requested, it would apply facts otherwise available pursuant to 19 U.S.C. § 1677e(a) (1994).  RR at 3.  Commerce further concluded that Ta Chen had failed to comply to the best its ability in providing the information, and that an adverse inference pursuant to 19 U.S.C. § 1677e(b) was warranted for the Sun sales.  Id. at 3-4.  In calculating a partial adverse facts available margin, Commerce "assigned the highest calculated margin calculated for these final remand results to be applied to Ta Chen's sales to Sun."  Id. at 5-6. The sale with the highest dumping margin was 30.95 percent, which Commerce used to recalculate the margin of 2.60 percent for Ta Chen's sales during the POR.  Id. at 14-15.  Ta Chen challenges the remand determination, contesting the application of adverse facts available and the selection of the margin.

**B. Alleged Commissions to Anderson**

In its motion for judgment on the agency record, Ta Chen challenged the Department's finding that Ta Chen had failed to

report commissions to a U.S. customer, Anderson Alloys.  In the Final Results, Commerce had applied partial adverse facts available to Ta Chen's sales to Anderson.  Final Results, 62 Fed. Reg. at 37,544.  The court found that Commerce's finding in this regard was not supported by substantial evidence.  Ta Chen, 1999 WL 1001194 at *16.  The court directed Commerce either to provide Ta Chen with an opportunity to submit evidence on the purported commissions or to disregard this issue on remand.  Id. at *17. On remand, Ta Chen responded to Commerce's supplemental questionnaire, stating that it had not made any sales during the POR on which it paid commissions to Anderson.  Remand Results at 5.  Commerce therefore did not apply facts available to Ta Chen's sales to Anderson upon remand.  Id.  This issue is thus no longer before the court.

## Discussion

## I.  Application of adverse facts available

Ta Chen contests the application of adverse facts available to its sales to Sun, arguing that it was unable to provide Sun's information because of the sale to Picol International and Masaru Kimura in July 1995.  Ta Chen argues that the Department's remand determination impermissibly concludes that Ta Chen is affiliated with the new entity, Picol Sun.  Ta Chen maintains that it did not have control over Picol Sun's records and could not force

Picol Sun to provide the necessary information.  Ta Chen states

that Department precedent does not support the application of

adverse facts when a respondent cannot obtain information from an

affiliate, but only supports the application of neutral facts

available.

Commerce concluded that it could expect Ta Chen to provide

Sun's information.  Commerce stated in the Remand Results:

> We are not convinced that Sun's closure is a sufficient
> explanation as to why Ta Chen cannot develop the necessary
> information.  The requested data relates to a period when Ta
> Chen and Sun were readily sharing the subject information.
> Thus, this is not a situation where one corporate entity
> would object to disclosure of confidential business
> information to another corporate entity.  In this situation,
> it is reasonable to expect Ta Chen to work with Sun's new
> owners to obtain the new information.

RR at 11.  As Commerce notes, the burden of creating an accurate

record rests with the respondent.  See Tianjin Mach. Import &

Export Corp. v. United States, 16 CIT 931, 936, 806 F. Supp.

1008, 1015 (1992) ("burden of creating an adequate record lies

with respondents and not with Commerce") (citation omitted).

Ta Chen does not and cannot contest the fact it had

operational control of Sun.  The court found Commerce's

affiliation finding supported by substantial evidence due to the

numerous connections between Ta Chen and Sun.  See Ta Chen, 1999

WL 1001194 at *4-10 (discussing Ta Chen and Sun's historical

ties, Sun's distribution of only Ta Chen products, Ta Chen's

custody of Sun's signature stamp, Ta Chen's credit monitoring of Sun, and debt financing arrangement between Ta Chen and Sun).  It is reasonable for the Department to conclude that this operational control gave Ta Chen access to Sun's records.  This conclusion is further supported by the fact that Ta Chen was able to provide other confidential records from Sun, such as Sun's federal income tax records.  See Final Results, 62 Fed. Reg. at 37,552.  It is also reasonable for Commerce to expect Ta Chen to maintain any relevant records pending the final outcome of the administrative review.  See Krupp Stahl A.G. v. United States, 17 CIT 450, 454, 822 F. Supp. 789, 793 (1993) (stating that respondents are responsible for maintaining their records during a pending litigation); Koyo Seiko Co. v. United States, 16 CIT 366, 376, 796 F. Supp. 517, 525 (1992) (holding that respondent had responsibility of keeping records for the ongoing investigation despite Commerce's "extraordinary delay").  In order to comply to the best of its ability, Ta Chen should have preserved Sun's information in the event that its sales were classified as CEP.

Ta Chen argues that it did not have reason to provide Sun's information until January 1997, because the Department did not state its intention to classify Ta Chen's sales as CEP sales until the issuance of the Preliminary Results in January 1997.

See <u>Certain Welded Stainless Steel Pipe from Taiwan</u>, 62 Fed. Reg. 1,435, 1,435-36 (Dep't Commerce 1997) (preliminary results of admin. rev.).  By that time, Ta Chen argues, it could not have provided the information because Sun had already been sold.  Ta Chen was nevertheless aware prior to January 1997 that its sales to Sun were at issue.  As early as July 1994, Ta Chen knew its relationship with Sun was at issue because the petitioners had called it to the Department's attention in the first administrative review.  <u>See</u> <u>Certain Welded Stainless Steel Pipe from Taiwan</u>, 64 Fed. Reg. 33,243, 33,244 (Dep't Commerce 1999) (final results of administrative review) (results from the first and second administrative reviews of Ta Chen).  Petitioners also renewed their concerns regarding Sun in July 1995.  <u>Id.</u>  Ta Chen had reason to argue that it was not affiliated with Sun, pursuant to the new definition of the term "affiliated party."  <u>Ta Chen</u>, 1999 WL 1001194 at *14.  But Ta Chen cannot claim that it was unaware of the possibility that its sales would be classified as CEP sales, in light of its numerous connections with Sun.  Ta Chen therefore could have, and should have, preserved its information on Sun's sales in order to provide full information for the Department.

Ta Chen also claims that the application of adverse facts available is inconsistent with prior determinations.  Ta Chen

cites in particular <u>Certain Cut-to-Length Carbon Steel Plate from Belgium</u>, 63 Fed. Reg. 2,959 (Dep't Commerce 1998) (final results of antidumping duty admin. rev.)[hereinafter "<u>Cut-to-Length from Belgium</u>"].  In that determination, Commerce stated it "may resort to adverse facts available in response to [respondent's] failure to report [information from an affiliate] unless [respondent] establishes that it could not compel its affiliate to report [the information]."  <u>Id.</u>  Commerce chose not to make an adverse inference in that determination because the Department had not informed the respondent of certain deficiencies in the respondent's attempt to show that it could not obtain the information from the affiliate.  <u>Id.</u>  Similarly, in the other determinations cited by Ta Chen, Commerce applied a general rule of not using adverse facts when the respondent could demonstrate that it did try to obtain information from an affiliate.  <u>See Roller Chain, Other than Bicycle, from Japan</u>, 62 Fed. Reg. 60,472, 60,476 (Dep't Commerce 1997) (notice of final results and partial recission of antidumping duty administrative review) (despite respondent's efforts, "it was not in a position to compel the affiliated customer to produce the information requested by the Department" and Department did not apply adverse facts available); <u>see also Certain Fresh Cut Flowers from Colombia</u>, 63 Fed. Reg. 5,354, 5,356 (Dep't Commerce 1998)

(preliminary results and partial termination of antidumping duty admin. rev.) (Department chose not to apply adverse facts for missing information where respondent's "exhaustive efforts at locating [the information from a former affiliate] . . . were futile"); Certain Cut-to-Length Carbon Steel Plate from Brazil, 63 Fed. Reg. 12,744, 12,751 (Dep't Commerce 1998) (final results of antidumping duty admin. rev.) (Department did not apply adverse inference where respondent "did attempt to obtain [COP] information from its affiliate" and where nature of affiliation was such that respondent could not compel affiliate to provide information).

On remand, Commerce applied this general rule as stated in Cut-to-Length from Belgium. As in that determination, the burden was on Ta Chen to show that it could not compel Sun to provide the information. Ta Chen failed to meet that burden. Upon remand, Ta Chen simply forwarded the Department's questionnaire to Picol Sun, and once Picol Sun's counsel stated that Sun did not wish to comply, Ta Chen informed the Department that it would be unable to provide Sun's information. This was not a sufficient effort on the part of Ta Chen. See Kawasaki Steel Corp. v. United States, No. 99-08-00482, Slip Op. 00-91 at 22-23 (Ct. Int'l Trade, Aug. 1, 2000) (holding that respondent's letters requesting information from affiliate were insufficient

to show respondent cooperated to best of its ability because respondent simply acquiesced in affiliate's refusal to provide information).

Ta Chen argues that it was not provided with notice that its attempts to compel Picol Sun to provide the information were deficient.  First, on remand time is of the essence, and parties need to take all steps necessary to comply with Commerce's requests promptly and forcefully.  Second, the court cannot conclude that one additional chance for Ta Chen to remedy its errors would have made a difference in this case, because the Department's decision to apply adverse facts available is also supported by the fact that Ta Chen could have done more to preserve the information on Sun's U.S. sales when it clearly had control of the information.  By not doing so, Ta Chen failed to comply to the best of its ability.  The court therefore affirms the application of adverse facts available pursuant to 19 U.S.C. § 1677e(b).

## II.  Selection of the adverse margin

In the Final Results, Commerce applied a 31.90 percent margin as partial adverse facts to Ta Chen's sales to Sun and Anderson.  Final Results, 62 Fed. Reg. at 37,555-56.  This margin was the highest rate from the less than fair value investigation. Ta Chen, 1999 WL 1001194 at *17.  This resulted in a weighted-

average margin of 6.06 percent.  Final Results, 62 Fed. Reg. at

37,556.  The court did not address Ta Chen's arguments concerning

corroboration of the margin from data outside the review in its

56.2 motion, in light of its remand instructions.  Ta Chen, 1999

WL 1001194 at *18.

On remand, Commerce applied an adverse inference only as to

Ta Chen's sales to Sun.  In recalculating the margin, Commerce

"assigned the highest calculated margin for these remand results

to be applied to Ta Chen's sales to Sun." RR at 5-6.[2]  The

margin used was 30.95 percent, which led to a recalculated

weighted-average margin of 2.60 percent.  Id. at 15-18.  In

choosing this margin, the Department explained:

> In conducting its own analysis of Ta Chen's U.S. sales, the
> Department found that the price and quantity of the sales
> for which a 30.95% dumping margin was calculated all fell
> within the normal range of price and quantity as the other
> sales; these sales were not unusually high or low in price
> or quantity.  Furthermore, the product for which a 30.95%
> dumping margin was calculated was a normal product of Ta
> Chen's . . . . Additionally, the Department chose the 30.95%
> rate because it was calculated from Ta Chen's own sales.

RR at 16-17.

Ta Chen first argues that an adverse margin is unwarranted.

Based on this assumption, Ta Chen maintains that the Department

should have followed its practice of using the weighted-average

---

[2]     Corroboration pursuant to 19 U.S.C. § 1677e(c) is not
challenged because Commerce selected a margin based on Ta Chen's
own information from this review.

dumping margin calculated for all of a respondent's other sales as the dumping margin for those sales lacking the information necessary to calculate a dumping margin.  See Static Random Access Memory Semiconductors from Taiwan, 63 Fed. Reg. 8,909, 8,920 (Dep't Commerce 1998) (notice of final determination of sales at LTFV) ("as facts available [Department] used the weighted-average dumping margin calculated for all of [respondent's] other sales").  Ta Chen acknowledges that doing so would have resulted in a weighted-average dumping margin of close to zero percent.  This argument fails because the use of an adverse inference is warranted based on these facts, as already discussed.  Commerce, therefore, was not required to use its neutral facts available methodology.

Ta Chen further argues that the Remand Results are contrary to court precedent and Commerce's own practice.  Ta Chen asserts that the margin used by Commerce is aberrant, and that such margins may not be used.  Under the former best information available ("BIA") rule, the court required Commerce to show that the margin it selected as BIA was not aberrant.  See National Steel Corp. v. United States, 18 CIT 1126, 1132-33, 870 F. Supp. 1130, 1136 (1994) ["NSC I"].  Ta Chen, however, misunderstands the court's concerns regarding aberrant margins.  The court in NSC I did not hold that because a significant portion of

respondent's sales had margins below the selected rate, that the selected rate was aberrant.  Rather, the court's concern was that Commerce show that the particular margin chosen bear a "rational relationship" to respondent's sales.  Id. (citation omitted). The NSC I court thus remanded the case for Commerce to explain why its selection of the BIA rate was not aberrant.  Id. at 1133, 870 F. Supp. at 1137.  After remand, the court accepted Commerce's criteria for selecting the highest non-aberrant margin as BIA.  National Steel Corp. v. United States, 20 CIT 100, 103, 913 F. Supp. 593, 596 (1996) ["NSC II"].  Commerce's guidelines for selecting the highest non-aberrant margin were to choose a margin "sufficiently adverse and . . . indicative of current conditions."  Id.

After a second remand, the court upheld the specific margin used by Commerce because the margin came from sales which involved a common product and fell within the mainstream of respondent's transactions.  National Steel Corp. v. United States, 20 CIT 743, 745-46, 929 F. Supp. 1577, 1580 (1996) ["NSC III"].  In upholding the BIA margin, the court also noted that "[there was] nothing in the record to indicate that [the] particular sale was not transacted in a normal manner."  Id.; see also Calcium Aluminate Cement, Cement Clinker and Flux from France, 59 Fed. Reg. 14,136, 14,141 (Dep't Commerce 1994) (final

determinations of sales at LTFV) ("When we resort to partial BIA, it is our practice to use the highest non-aberrational margin based on respondent's reported sales.  This is an adverse figure, yet is based on the respondent's calculated margins.")[3] Commerce's selection of the 30.95 percent margin as the adverse rate in this case conforms to the court's requirement that the rate not be aberrant, because although the rate is adverse, it is indicative of Ta Chen's sales.

The Department continues to use the highest non-aberrational margin as adverse facts available.  See Stainless Steel Sheet and Strip in Coils from Germany, 64 Fed. Reg. 30,710, 30,714 (Dep't Commerce 1999) (final determination of sales at LTFV) ("As adverse facts available we have assigned the highest non-aberrational margin calculated for this final determination . . .

---

[3]     Commerce certainly may not use a margin known to be inaccurate.  See D&L Supply Co. v. United States, 113 F.3d 1220, 1224 (Fed. Cir. 1997) (holding that Commerce may not use highest margin from prior administrative review as BIA where that margin has been "demonstrated to be inaccurate").  The margin used here, however, is not inaccurate.  It was calculated based on Ta Chen's own reported data.  The court in D&L Supply noted that the purpose of using the highest prior antidumping duty rate as BIA is to "[offer] some assurance that the exporter will not benefit from refusing to provide information, and [to produce] a . . . rate that bears some relationship to past practices in the industry in question."  Id. at 1223.  While the margin used here was not drawn from a prior review, the same goals are served by using the 30.95 percent margin: Ta Chen will not benefit from refusing to provide the information, and the margin bears a rational relationship to Ta Chen's selling practices.

.")  In that determination, Commerce determined the highest non-aberrational margin by examining the frequency distribution of the margins calculated for the respondent's reported data. Commerce then selected the highest margin for the 10 percent of respondent's transactions which fell within a specific range. Id.  Ta Chen argues that the Department did not use this same methodology in the remand results.  The Government acknowledges that Commerce did not use the precise methodology as stated in Stainless Steel Sheet and Strip in Coils from Germany, because to have done so would have resulted in a final margin of zero percent, thereby eviscerating the adverse inference.

Ta Chen argues that Commerce cannot choose a facts available margin based solely on the fact that it is the highest margin available.  Ta Chen relies on Rhone Poulenc, Inc. v. United States, 899 F.2d 1185 (Fed. Cir. 1990).  Rhone Poulenc, however, supports Commerce's position.  Analyzing Commerce's practice under BIA, the Federal Circuit stated that it was appropriate for Commerce to presume that the highest prior margin was the best information of current margins.  This presumption "reflect[ed] a common sense inference that the highest prior margin is the most probative evidence of current margins because, if it were not so, the importer, knowing of the rule, would have produced current information showing the margin to be less."  Id. at 1190.  This

reasoning also applies in this case because using the highest calculated dumping margin provided an incentive for Ta Chen and other respondents to produce information.

Ta Chen also contests the Department's characterization of the sales with the 30.95 percent dumping margin as falling within the normal range of price compared to other sales. Ta Chen states that the 0.04 percent of sales with a 30.95 percent dumping margin were at a significantly lower price than other Ta Chen sales. Ta Chen Remand Br. at 28. Commerce's determination that the price of the sales for which a 30.95 percent dumping margin was calculated fell within the normal range of price as other sales, is supported. In comparing price, Commerce printed lists of the twenty-one highest negative and positive margins for Ta Chen. The price of the sales with the 30.95 percent dumping margin fell within the range of these prices.[4] As in NSC III, 20 CIT at 746, 929 F. Supp. at 1580, there is nothing to indicate that the sales with this particular margin were not "transacted in a normal manner."[5]

---

[4] The prices for the positive dumping margins ranged from [ ] to [ ]. Final Margin Calculations (Jan. 18, 2000), at 54, C.R. Doc. 1269, Def.'s Remand Ex. 2, at 1. The price of the 30.95 percent sale was [ ]. Id. The prices for the negative dumping margins ranged from [ ] to [ ]. Id. at 56, Def.'s Remand Ex. 2, at 2.

[5] Ta Chen also contests Commerce's characterization of
(continued...)

Ta Chen maintains that Commerce may not use a margin where fewer than 0.5 percent of the respondent's sales had that margin, because such sales are de minimis.  The Government argues that "the number of sales with the chosen dumping margin [is not] a factor in determining whether the margin is useable as facts available.  Instead, Commerce seeks to determine whether the sale on which the margin is derived is otherwise representative of a respondent's other sales."  Gov't Remand Br. at 31-32.  Ta Chen relies on two revocation decisions for its position.  See Pure Magnesium from Canada, 64 Fed. Reg. 50,489 (Dep't Commerce 1999) (final results of antidumping duty admin. rev. and determination not to revoke order in part); Certain Corrosion-Resistant Carbon Steel Flat Products and Certain Cut-to-Length Carbon Steel Plate

---

[5](...continued)
the 30.95 percent sales as falling within the range of Ta Chen's other sales for quantity.  The Government explains Commerce's position by noting that the quantity of the sales with the 30.95 percent margin was [ ], and the range for the other sales was from [ ] to [ ].  Govt' Remand Br. at 29 (referring to Ta Chen's data sets attached to Ta Chen's Supplemental Questionnaire Response (Nov. 12, 1996), C.R. Doc. 8).  Given the range, this is not a particularly telling factor; but Commerce's other bases for testing the margin are supportive of its choice.  Further, the highest margin selected was close to margins for other sales, although the percentage of sales with positive margins was small.
     Ta Chen also argues that the number of sales of the product was not typical because it only represented 2.4 percent of Ta Chen's POR sales.  The Government states that Ta Chen made [ ] sales of this product during the POR.  Id.  The Government notes that the number of sales is substantial, "regardless of the percentage these sales represent of Ta Chen's total sales." Gov't Remand Br. at 29.

from Canada, 64 Fed. Reg. 2,173 (Dep't Commerce 1999) (final

results of antidumping duty admin. revs. and determination to

revoke in part).  Commerce distinguished these determinations in

the Remand Results on the basis that they involved the issue of

whether dumping margins were reflective of a company's normal

practice in the context of determining whether the sales had been

made in commercial quantities for purposes of a revocation

decision.  RR at 17.  Those determinations did not involve the

use of adverse facts available.  Commerce stated that it had

"never determined that an adverse facts available margin should

be reflective of a respondent's actual dumping margins.  The

purpose of applying adverse facts available is to induce

respondents to cooperate with the Department's proceedings."  Id.

While the court does not accept Commerce's proposition that

accuracy is not a goal when using adverse facts available,[6] it

agrees with Commerce that in these particular circumstances, if

Commerce rejected Ta Chen's sales which had positive dumping

---

[6]     The court has previously noted its concern that facts
available margins bear a rational relationship to the matter to
which they are applied.  See Ferro Union, Inc. v. United States,
44 F. Supp.2d 1310, 1334-35 (Ct. Int'l Trade 1999) (Commerce must
select a total substitute margin which is relevant and reliable,
and bears rational relationship to matter to which it is
applied); World Finer Foods, Inc. v. United States, No. 99-03-
00138, 2000 WL 897752 at *6 (Ct. Int'l Trade June 26, 2000)
(court will not uphold use of individual transaction margins
which bear no apparent relationship to current level of dumping
in industry to corroborate a total substitute margin).

margins on the ground that they were <u>de minimis</u>, Commerce would not be applying an adverse inference, while still using Ta Chen's information, because Ta Chen would receive a zero percent dumping margin.

Ta Chen lastly argues that Commerce's choice of the partial adverse facts margin is inconsistent with the record as a whole. Ta Chen maintains that it is unreasonable to conclude that the partial 30.95 percent margin is indicative of Ta Chen's actual selling practices. Ta Chen ignores that the methodology chosen by Commerce was the only way to apply an adverse inference in this case, while still using respondent's own information. Ta Chen's argument that a lower margin, of zero or 3.27 percent,[7] would also serve the purpose of inducing Ta Chen to cooperate is not persuasive. One of the purposes of using adverse facts available is to "ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." Statement of Administrative Action ("SAA"), accompanying H.R. Rep. No. 103-826(I), at 870, <u>reprinted in</u> 1994 U.S.C.C.A.N. 3773, 4199; <u>see also</u> <u>NSC I</u>, 18 CIT at 1132, 870 F. Supp. at 1136 (recognizing under BIA that "although the ultimate

_____

[7]     Ta Chen received a 3.27 percent dumping margin in the original less than fair value investigation. <u>Certain Welded Stainless Steel Pipe from Taiwan</u>, 57 Fed. Reg. 62,300, 62,301 (Dep't Commerce 1992) (amended final determination and antidumping duty order).

purpose of BIA is not to punish, BIA is intended to be adverse"). If Commerce had used one of the lower margins, as suggested by Ta Chen, Ta Chen might have achieved a better result by failing to cooperate than by cooperating and providing Sun's information. The SAA also states that Commerce does not have to prove that the facts available are the best alternative information. "Rather, the facts available are information or inferences which are reasonable to use under the circumstances." SAA at 869, 1994 U.S.C.C.A.N. at 4198. The court therefore affirms the use of the 30.95 percent margin as partial adverse facts available, resulting in an overall 2.60 percent margin for Ta Chen after remand.

## Conclusion

Commerce's application of partial adverse facts available and its selection of the adverse margin were in accordance with law and supported by substantial evidence.  The remand results are therefore affirmed in their entirety.

_____
Jane A. Restani
Judge

Dated:    New York, New York

          This 25th day of August, 2000.