**Slip Op. 99-24**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| ASOCIACION COLOMBIANA de EXPORTADORES de FLORES, et al., | |
| Plaintiffs, | |
| v. | Before: Pogue, Judge |
| UNITED STATES | Consol. Court No. 96-09-02209 |
| Defendant, | |
| FLORAL TRADE COUNCIL, | |
| Defendant-Intervenor. | |

[Final results of Commerce's redetermination sustained in part and remanded in part.]

Decided: March 16, 1999

Arnold & Porter (Michael T. Shor) for Plaintiffs Asocolflores, the Flores del Rio Group, and the Florex Group.

Akin, Gump, Strauss, Hauer & Feld, L.L.P. (Patrick F. J. Macrory, Spencer S. Griffith, Lee Harriss Roberts, J. David Park) for Plaintiffs Eden Floral Farms, Equiflor, Espirit Miami, Floralex Ltda., the Agrodex Group, the Caicedo Group, and the Santana Group.

White & Case (Alan M. Dunn, Kristina Zissis) for Plaintiffs the HOSA Group.

David W. Ogden, Acting Assistant Attorney General, Civil Division, U.S. Department of Justice; David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice; Velta A. Melnbrencis, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice; Lucius B. Lau, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Of Counsel; Karen L. Bland, Jeffrey C. Lowe, Bernd G. Janzen, Sanjay J. Mullick, Attorney-Advisors, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, for Defendant.

Stewart and Stewart (Terence P. Stewart, James R. Cannon, Jr., Amy S. Dwyer) for Defendant-Intervenor Floral Trade Council.

## OPINION

**Pogue, Judge:** On March 25, 1998, this Court remanded certain aspects of the Department of Commerce's ("Commerce" or the "Department") final determination in <u>Certain Fresh Cut Flowers From Colombia</u>, 61 Fed. Reg. 42,833 (Dep't Commerce 1996) (final results antidumping duty admin. reviews) ("Final Results"). <u>Asociacion Colombiana de Exportadores de Flores v. United States</u>, 22 CIT __, 6 F. Supp.2d 865 (1998)("<u>Asociacion Colombiana</u>").[1]

The remand Order directed Commerce to reconsider the following aspects of the Final Results: (1) the methodology for the treatment of imputed credit expense; (2) the conclusion that U.S. selling expenses are a reasonable surrogate for selling expenses incurred on home market sales for purposes of calculating constructed value; and (3) the use of best information available ("BIA") for Santa Helena, a member of the Florex Group.  The Court also instructed Commerce to correct its omission of a company-specific margin for Flor Colombia, S.A., for the seventh period of review.  Plaintiffs Asocolflores, AFIF, and 81 individual Colombian producers of flowers, Florex[2], and Santa Helena[3] ("Plaintiff"), object to each aspect of Commerce's remand determination.

---

[1]Familiarity with the Court's earlier decision in this case is presumed.

[2]Florex comprises Flores de Exportacion S.A., Agricola Guacari S.A., Flores Altamira S.A. and Four Farmers Inc.

[3]Santa Helena comprises Santa Helena S.A., Flores del Salitre Ltda. and S.B. Talee de Colombia Ltda.

## Discussion

### 1. Imputed Credit

In the underlying administrative review, Commerce made a circumstance of sale adjustment to foreign market value to account for imputed credit expenses incurred on U.S. sales. For those respondents that had actual U.S. loans during the period of review, Commerce calculated the U.S. credit expense using interest rates associated with those loans. Final Results, 61 Fed. Reg. at 42,848. For those respondents that did not have actual U.S. dollar-denominated loans, Commerce used a peso-based interest rate for the U.S. credit calculation. Commerce used the respondent's actual peso borrowing rate and adjusted that rate for the devaluation of the peso against the U.S. dollar. Id. at 42,849. This Court upheld as reasonable Commerce's determination that the Colombian producers' borrowing experience was an appropriate surrogate for the cost of extending credit to their U.S. customers. Asociacion Colombiana, 22 CIT at __, 6 F. Supp.2d at 878. The Court, however, remanded the issue to the Department to "cite evidence to support the conclusion that its methodology - adjusting for the devaluation of the peso against the dollar - is well founded." Id. Specifically, the Court directed Commerce to explain "why it simply subtracted the devaluation rate from the peso-borrowing rate." Id.

Commerce states in the final results of redetermination ("Remand Determination"), that in order "to calculate the cost of

financing the U.S. sale, we subtract the amount by which the Colombian peso was devalued vis-a-vis the U.S. dollar from the peso-denominated interest rate." Remand Determination at 4. Commerce explains its rationale noting, "[w]e are attempting to measure the opportunity cost of a sale, not the effective cost of a loan." Id. at 6. To illustrate, Commerce modifies an example provided by Plaintiff in its initial brief. See Initial Mem. of Pls. Asocolflores in Supp. Mot. J. Agency R. (April 21, 1997) at 22-23.

In the example, Commerce assumes that a company makes a sale of 10,000 U.S. dollars and that the exchange rate on the date of sale is 589.14 pesos per dollar. Remand Determination at 4. The customer pays the company one year later and the exchange rate on the date of payment is 725.17 pesos per U.S. dollar. Id. The company then borrows 10,000 pesos at an annual interest rate of 40%, with the principal and interest due one year later. Id.

In this example, had the customer paid on the date of sale, the company would have received 5,891,400 pesos and would not have accrued any interest expense. Because the customer actually paid a year later, the company accrues 2,356,560 pesos of interest (40% times 5,891,400). Id. at 4. Because the peso has been devalued against the U.S. dollar during that period of time, however, the company when it is paid actually receives 7,251,700 pesos (the date-of-payment exchange rate, 725.17, times the dollar amount of the sale, 10,000). Id. at 5. Thus, the company receives 1,360,300 pesos more than it would have received if the customer paid on the

date of sale. Id. Therefore, the actual interest expense for the sale is 996,260 pesos (the amount of interest owed at the conclusion of the loan, 2,356,560, minus the additional revenue received as a result of devaluation, 1,360,300). Significantly, Commerce determines the imputed interest amount by dividing the actual interest expense for the sale, 996,260, by the value of the sale at the time of the sale, 5,891,400 pesos, which is 16.91% of 5,891,400 pesos. Id. This percentage equals the annual interest rate (40%) minus the rate of devaluation (23.09%). Id.

Plaintiff challenges Commerce's methodology, arguing that Commerce's formula "in fact measures only the effective cost of the loan in peso terms; it did not measure the opportunity cost of the dollar sale." Pl.'s Comments Opposing Remand Determination ("Pl.'s Comments") at 19-20. Specifically, Plaintiff maintains that Commerce erroneously calculates the credit expense by using the exchange rate at the time of the sale.[4] Id. at 20. Plaintiff contends that the opportunity cost to the company, in dollar terms is the net credit expense measured at the exchange rate on the date

_____

[4]Here, Commerce points to its regulation concerning currency conversion, 19 C.F.R. § 353.60 (1995), asserting that when it makes fair market value comparisons, "we use the [constructed value] at the time of the U.S. sale and any necessary currency conversions must be linked to that date." Remand Determination at 6. This regulation, however, sets out the rule for converting a foreign currency to the equivalent amount of U.S. dollars. It has no bearing on the calculation of the proper imputed credit expense in calculating foreign market value.

the company paid the interest and repaid the loan.[5]  Id. at 20.
Plaintiff maintains that the Department's calculation overstates
the opportunity cost to the company of financing the sale.  The
Court agrees.

Commerce's methodology appears to measure only the effective
cost of the loan in peso terms[6], not the opportunity cost of the
dollar sale.  This is apparent by continuing with the Department's
example.  Commerce would calculate the imputed credit expense by
applying the 16.91% to the sales value in dollars ($10,000),
yielding a credit expense for the sale of $1,691.  This approach,
however, overstates the opportunity cost to the company.  On the
date of payment the company must pay a total of 8,247,960 pesos, or
$11,374 (total peso amount that the company must pay back divided
by the date-of-payment exchange rate).  Thus, if the company sets
aside $11,374 on the date of sale, it can make the payment.[7]

---

[5]"[T]he opportunity cost of the delay in payment in dollar
terms is equal to 13.74 percent of the original $10,000 value of
the sale.  The sale is worth 5,891,400 pesos ($10,000 x 589.14) on
the date of sale.  One year later, the company must repay the loan
plus 40 percent interest (2,356,560 pesos), for a total of
8,247,960 pesos).  This total peso payment is equal to $11,374
(8,247,960÷725.17), and thus the opportunity cost of extending the
credit in dollar terms is ($11,374 - $10,000)/$10,000, or 13.74
percent."  Pl.'s Comments at 19.

[6]As noted, Commerce divides the actual net credit expense
(996,260) by the peso value of the original sale (5,891,400) to
calculate a rate of 16.91%.  Remand Determination at 5.

[7]"The imputation of credit cost is based on the principle of
the time value of money."  LMI-LaMetalli Industriale, S.p.A. v.
United States, 8 Fed. Cir. (T) 157, 162, 912 F.2d 455, 460 (1990).
Here, it costs the company an extra 13.74% of the sales value on
the date of sale, to allow a buyer to delay a payment for a year.

Commerce's conclusion that the cost is 16.91% of the sales value suggests that the company would have to set aside $11,691 (net credit expense divided by the original peso value of the sale) at the beginning of the year.  If the company set aside this amount, however, it could pay the hypothetical loan at the end of the year, and still have $317 left over.  Therefore, Commerce's example does not support its rationale - "[w]e are attempting to measure the opportunity cost of a sale" - for simply subtracting the devaluation rate from the peso-borrowing rate.  Accordingly, the Court remands this issue to Commerce to apply a methodology that supports its rationale of calculating the opportunity cost of the sale.

### 2. U.S. Selling Expenses in Calculating Constructed Value

In the preliminary results of the underlying administrative review, Commerce used U.S. selling expenses incurred in Colombia (on export sales) for purposes of calculating a surrogate value for home-market selling expenses in calculating constructed value. Final Results, 61 Fed. Reg. at 42,843.  In the Final Results Commerce used all U.S. selling expenses regardless of where the expenses were incurred as the surrogate for home-market selling expenses.  Id.  This Court upheld Commerce's decision to use the entire universe of U.S. selling expenses in its calculations.[8]  See

---

[8]Asocolflores argues at great length that Commerce had no legal basis to add selling expenses on U.S. sales to constructed value.  Pl.'s Comments at 5-9.  This Court, however, sustained Commerce's authority to use all U.S. selling expenses as the surrogate for home-market selling expenses.  See Asociacion Colombiana, 22 CIT at __, 6 F. Supp.2d at 880 (finding that

<u>Asociacion Colombiana</u>, 22 CIT at __, 6 F. Supp.2d at 880.  The Court, however, remanded this issue to the Department for reconsideration stating that "Commerce failed to cite evidence to support the conclusion that expenses incurred on sales in the United States would be a reasonable surrogate for selling expenses incurred for home-market sales."  <u>Id.</u>

Upon remand, Commerce explains, "[t]he selling expenses incurred in the United States on U.S. sales are mainly commissions (to unrelated commissionaires), overhead expenses, such as refrigeration, sales office expenses, directors' salaries, communication expenses (i.e., telephone, facsimile), office supplies, and travel expenses similar to those which <u>likely would be</u> incurred on sales of flowers to any market."  Remand Determination at 7 (emphasis added).  Commerce concludes "<u>the record shows</u> that there are no unusual market-specific selling expenses incurred in selling to the United States that would not likely be incurred on sales in Colombia."  <u>Id.</u> at 8 (emphasis added).

Commerce directs the attention of the Court to a single piece of evidence, Florex's description of its U.S. selling expenses. <u>Id.</u> at 7-8 (citing P.R. Doc. No. 42, Florex Group Section A Response (Nov. 29, 1993), App. A-2).  This description, however, is

Commerce's approach was reasonable because by including selling expenses associated with U.S. sales, Commerce ensured that its calculation of general expenses would remain unaffected by the shifting of expenses between the exporter and any related U.S. importer).

not an examination of how Florex would make sales in Colombia.[9]

Thus, it does not provide evidence to support Commerce's conclusion that there are no unusual market-specific selling expenses incurred in selling to the United States that would not likely be incurred on sales in Colombia.

Plaintiff correctly points out that on remand Commerce simply provides a more detailed explanation of its previous decision. Commerce's determination continues to suffer from the flaw pointed out by the Court in Asociacion Colombiana, 22 CIT at __, 6 F. Supp.2d at 880.  There is no record evidence to support Commerce's conclusion that expenses incurred on sales in the United States are a reasonable surrogate for selling expenses incurred for home-market sales as required by the statute.

Commerce contends that because "the surrogate selling expenses are based on actual U.S. sales expenses reported by respondents . . . the Department's methodology is supported by substantial evidence."  Remand Determination at 12 (emphasis added).  The fact, however, that the sales expenses used are the actual U.S. sales

_____

[9]The antidumping statute requires Commerce to include in its calculation of constructed value "an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise under consideration which are made by producers in the country of exportation, in the usual commercial quantities and in the ordinary course of trade . . . ."  19 U.S.C. § 1677b(e)(1)(B)(1988)(emphasis added).  In turn, Commerce's regulations, provide, in pertinent part, that constructed value shall include "[g]eneral expenses . . . usually reflected in sales of merchandise of the same class or kind as the merchandise by producers in the home market country. . . ."  19 C.F.R. § 353.50(a)(2)(1995)(emphasis added).

expenses reported does not constitute evidence that they are representative of the expenses that would be incurred in a hypothetically viable Colombian market for export-quality flowers. Although Commerce correctly notes that a "surrogate is not intended to be an exact replica of what expenses in the home market would be," Remand Determination at 9, nevertheless, the substantial evidence standard requires more than what Commerce has provided.

The court will uphold a Commerce determination in an administrative review as long as it is in accordance with law and supported by substantial evidence on the record. See Section 516A(b)(1)(B)(i) of the Tariff Act of 1930, as amended 19 U.S.C. § 1516a(b)(1)(B)(i)(1994). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938); Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951)(quoted in Matsushita Elec. Indus. Co. v. United States, 3 Fed. Cir. (T) 44, 51, 750 F.2d 927, 933 (1984)). Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 619-20 (1966).

Commerce also stated an additional reason why its use of U.S. selling expenses was appropriate:

Finally, we note that there is no alternative to using U.S. selling expenses. As noted above, there are no home-market selling expenses because there is no viable home market. We have also determined that, for the same reasons that we cannot use third-country sales as a basis for foreign market value, it would be inappropriate to use third-country selling expenses. Thus, we find that, not only are U.S. selling expenses a reasonable surrogate for home market selling expenses, they are also the only available surrogate for home-market selling expenses. Therefore, because there is no more appropriate surrogate than U.S. selling expenses, we have continued to use U.S. selling expenses as a surrogate for home-market selling expenses.

Remand Determination at 10.

This court has recognized Commerce's authority to use information available to it when it was left with "no alternative." This line of reasoning, however, has been limited to the court's review of Commerce's actions in a "best information available" context. See e.g., Emerson Power Transmission Corp. v. United States, 19 CIT 1154, 1159, 903 F. Supp. 48, 53 (1995)("the consequence of failing to provide adequate and timely information is to leave Commerce with no alternative but to proceed with its review relying upon the best information available); Mitsubishi Heavy Indus., Ltd. v. United States, 17 CIT 1024, 1031, 833 F. Supp. 919, 925 (1993)(noting that the "the consequences of failing to provide adequate and timely information is to leave Commerce with no alternative but to proceed with its review relying upon the best information available")(quoting Ansaldo Componenti, S.p.A. v. United States, 10 CIT 28, 38, 628 F. Supp. 198, 206 (1986)); NSK Ltd. v. United States, 16 CIT 401, 406, 794 F. Supp. 1156, 1160 (1992)("Nevertheless, the fact remains that NSK did not produce the

data, thus leaving Commerce with no alternative but to invoke the best information rule.").

The Court also recognizes that Commerce may, based on its experience in administering the statute, make justifiable inferences on the record before it.  See Radio Officers' Union v. NLRB, 347 U.S. 17, 50 (1954); see also Matsushita Elec. Indus. v. United States, 3 Fed. Cir. (T) 44, 51, 750 F.2d 927, 933 (1984)(reviewing whether "the evidence and reasonable inferences from the record support the [ITC] finding."); Borden Inc. v. United States, 22 CIT __, __, slip op. 98-167, at 4 (Dec. 16, 1998)("Commerce must necessarily draw some inferences from a pattern of behavior.").  The evidence relied upon by Commerce in this case, however, standing alone, does not provide a sufficient basis for the conclusions drawn by the Department.

Commerce's determination here amounts to nothing more than conclusory statements that expenses incurred on sales in the United States are a reasonable surrogate for selling expenses that would be incurred in a viable home market.  See Remand Determination at 7 ("The selling expenses incurred in the United States on U.S. sales are . . . similar to those which likely would be incurred on sales of flowers to any market.")(emphasis added); id. at 8 ("there are no unusual market-specific selling expenses incurred in selling to the United States that would not likely be incurred on sales in Colombia").  Speculation, however, is not support for a finding. See Asociacion Colombiana de Exportadores de Flores v. United

States, 13 CIT 13, 15, 704 F. Supp. 1114, 1117 (1989), aff'd, 901 F.2d 1089 (Fed. Cir. 1990).  "This type of conjecture is exactly the type of reasoning the substantial evidence standard aims to prevent, and is totally unsupported by substantial evidence." China National Arts and Crafts Import and Export Corp. v. United States, 15 CIT 417, 422, 771 F. Supp. 407, 412 (1991).

"[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained."  SEC v. Chenery Corp., 318 U.S. 80, 94 (1943).  Therefore, the Court remands to afford Commerce the opportunity to provide further evidence showing that expenses incurred on sales in the United States are a reasonable surrogate for selling expenses incurred for home-market sales or to adopt a surrogate supported by substantial evidence on the record.

### 3.  Choice of BIA for the Santa Helena Group

For the preliminary results of the underlying administrative review, Commerce applied a second-tier BIA rate[10] for the Santa

---

[10]The application of BIA may be either "total" or "partial." Commerce applies total BIA when a party has failed to submit information in a timely manner, or when part of the submitted data is sufficiently flawed, rendering the entire response unreliable and unusable.  See Ad Hoc Comm. of AZ-NM-TX-FL Producers of Gray Portland Cement v. United States, 18 CIT 906, 915, 865 F. Supp. 857, 865 n.21 (1994), aff'd, 68 F.3d 487 (Fed. Cir. 1995); National Steel Corp. v. United States, 18 CIT 1126, 1131, 870 F. Supp. 1130, 1135 (1994).   When Commerce resorts to total BIA, Commerce implements a "two-tier BIA methodology," which factors in a party's cooperation in the BIA determination.  Id.  Commerce uses partial BIA when only one part of the submitted information is deficient, but is still reliable in most other respects.  See Ad Hoc Comm., 18 CIT at 915, 865 F. Supp. at 865 n.21.

Helena Group ("Santa Helena") due to its failure to correct its data or provide a narrative explanation in its reporting of amortized preproduction expenses pursuant to the crop adjustment methodology.[11]  In the Final Results, Commerce collapsed the Santa Helena and the Florex Groups.  Commerce combined the Santa Helena rate with the rates for the remaining members of the Florex Group.[12] This Court upheld Commerce's application of BIA as appropriate due to the deficiencies in Santa Helena's reported preproduction expenses.  See Asociacion Colombiana, 22 CIT at __, 6 F. Supp.2d at 892.  The Court, however, remanded this issue to Commerce to reconsider whether Santa Helena's improper crop amortization rendered its entire response unreliable and to explain the findings supporting its decision.  Id.

Upon remand, Commerce reconsidered its position and determined that applying a partial BIA to Santa Helena's crop adjustment reporting is appropriate.  Remand Determination at 14.  "We have decided this because Santa Helena responded adequately to the rest

---

[11]Normally, Commerce requires respondents to report preproduction expenses consistent with their home country generally accepted accounting principles ("GAAP"), which typically are reflected in respondents' ordinary books and records.  See Final Results, 61 Fed. Reg. at 42,857.  In prior reviews Commerce accepted preproduction expenses that were amortized over a longer period than the period contained in respondents' books and records.  Commerce terms this alternative approach to preproduction expenses the "Crop Adjustment Method."  Id.

[12]Commerce applied the second-tier BIA rate for sales by Santa Helena during each period of review, weighting the BIA margins assigned to such sales with the calculated margins on sales by the other members of the Florex Group.  See Remand Determination at 13-14.

of our questionnaire and supplemental questionnaire and because there is an appropriate adjustment that can be made to Santa Helena's crop adjustment methodology which will obviate the need for total BIA."  Id.

As partial BIA, Commerce chose to deny the claimed adjustment for carrying forward costs incurred in the current (monthly) period.  That is, the Department chose to apply all of the reported costs in the current period to sales in the current period and included costs carried into the current period from prior periods. C.R. Doc. No 1 (Memo to File Fr: Richard Rimlinger, May 26, 1998) ("Redetermination Memo") at 2.   Thus, Commerce disallowed any amortized amount to be carried forward.[13]   In addition, Commerce made an adjustment to account for the effects of inflation.[14] Specifically, Commerce made an adjustment to lines 108 (preproduction materials costs paid in review period), 150

---

[13]Consistent with Colombian GAAP, in calculating the cost of production for the subject flowers, there are two alternative methodologies for reporting preproduction expenses for calculating constructed value.  Companies may report preproduction costs in the month such expenses are incurred, along with the production expenses incurred in tending plants actually in production that month.   Alternatively, companies may capitalize all expenses associated with the preproduction phase, and amortize them in the months in which the plants are in production.   Both of these methodologies have been approved by this court.  See e.g., Associacion Colombiana de Exportadores de Flores v. United States, 13 CIT 13, 17-18, 704 F. Supp. 1114, 1119, aff'd, 901 F.2d 1089 (Fed. Cir. 1989); Floral Trade Council of Davis v. United States, 17 CIT 274, 275 (1993).

[14]As a result of Commerce's decision to resort to partial BIA for Santa Helena, Commerce made certain corrections to the group-wide rates for the Florex Group.   Redetermination Memo at 2-3; Remand Determination at 20.  No party challenges these changes.

(preproduction labor costs paid in review period), 181 (depreciation), and 214 (other general and administrative expenses). Id. As a surrogate for increasing the asset value reported by Santa Helena, the Department used the percentage increase in these lines as reported by the Florex Group in response to the Department's July 1995 supplemental questionnaire requesting adjustments to certain costs for inflation. Id.

Plaintiff challenges Commerce's choice of BIA, arguing that the Department uses a highly punitive preproduction expense calculation.[15] Pl.'s Comments at 26. Plaintiff argues that Commerce has inappropriately mixed the two cost of production methodologies by combining Santa Helena's (monthly) preproduction expenses reported on a currently incurred basis and its reported preproduction expenses carried forward from prior periods calculated using an amortization methodology. Id. Plaintiff maintains that Commerce's approach results in the double counting of Santa Helena's preproduction expenses. Id. at 24.

---

[15]Plaintiff once again challenges Commerce's resort to BIA, arguing that Commerce should have relied upon Santa Helena's preproduction expenses reported in the (alternative) current basis method because there is no evidence that this reported data is incorrect. Pl.'s Comments at 28. Plaintiff asserts that because Commerce refers to its crop adjustment method as "optional" and "Commerce affords respondents the option of submitting preproduction expense data in one of two ways, and a respondent submits it both ways, Commerce has no basis for penalizing that respondent simply because one methodology was applied incorrectly." Id. at 30. This Court has already decided that Commerce's decision to resort to BIA was appropriate. Asociacion Colombiana 22 CIT at __, 6 F. Supp.2d at 892. Accordingly, the Court will not revisit the issue here.

Although Congress expressly mandated that Commerce use the best information available when faced with a party who is unwilling or unable to participate in the administrative review proceedings, it did not explicitly define what type of information constituted the "best" information.[16]  Hence, because Congress has "explicitly left a gap for the agency to fill" in determining what constitutes the best information available, Commerce's construction of the statute must be accorded considerable deference.  <u>Allied-Signal Co. v. United States</u>, 996 F.2d 1185, 1191 (Fed. Cir. 1993)(citing <u>Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 843-44 (1984)).

"The purpose behind permitting Commerce to resort to BIA is to induce respondents to provide Commerce with requested information in a timely, complete, and accurate manner so that the Department may determine current margins within statutory deadlines." <u>National Steel Corp. v. United States</u>, 18 CIT 1126, 1129, 870 F. Supp. 1130, 1134 (1994) (quoting <u>Rhone Poulenc Inc. v. United States</u>, 899 F.2d 1185, 1191 (1990)).  "Although the ultimate purpose of BIA is not to punish, BIA is intended to be adverse," <u>see</u> <u>Pulton Chain Co. v. United States</u>, 17 CIT 1136, 1139 (1993). At the same time, Commerce's choice of BIA must be reasonable.  "A rational relationship must exist between the 'data chosen and the matter to which they are to apply.'"  <u>Manifattura Emmepi S.p.A. v.</u>

---

[16]The agency shall, "whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, use the best information otherwise available." 19 U.S.C. § 1677e(c)(1988).

United States, 16 CIT 619, 624, 799 F. Supp. 110, 115 (1992); see also D & L Supply Co. v. United States, 113 F.3d 1220 (Fed. Cir. 1997) (finding that it is "irrational" to uphold a rate when its foundation has been invalidated).

Here, Commerce utilized to the extent possible all current expenses reported by Santa Helena.  Remand Determination at 14-17. Because there were errors in Santa Helena's amortizations[13], however, the Department also included costs carried into the current period from prior periods, explaining that it did so, "in order to ensure that we capture all of the costs attributable to the current period."  Id.  The Court finds that Commerce's approach was reasonable.

Because the deficiency in the record was Santa Helena's crop adjustment methodology, Commerce appropriately denied the claimed adjustment for carrying forward costs incurred in the current period to future periods.  Commerce used record evidence to the extent possible, while ensuring that Santa Helena did not benefit from its failure to properly report costs.  In resorting to partial BIA, Commerce appropriately utilized an adverse inference.  See National Steel Corp., 18 CIT at 1131, 870 F. Supp. at 1135 ("When errors in the information submitted constitutes a failure to

---

[13]Santa Helena reported the "same values in all months for monthly preproduction expenses actually incurred as it did for monthly expenses carried forward to future periods."  Florex Brief at 15.  Santa Helena acknowledges that "its amortizations were reported incorrectly, and that the expenses carried forward in the beginning months of each review period should be less than the expenses actually incurred."  Id.

provide the necessary data, Commerce applies a more adverse dumping margin as partial BIA."); Ad Hoc Committee, 18 CIT at 915, 865 F. Supp. at 867 n.22 (stating that in a "partial BIA" situation the only instance in which BIA is not adverse is when there is an inadvertent gap in the record, when only a minor or insignificant adjustment is involved, or when the missing data is beyond the control of the respondent). Further, Commerce's BIA choice represents a reasonable attempt to balance the "rational relationship" requirement, with the purpose of inducing respondents to cooperate with Commerce. See supra pp. 17-18.

Moreover, Commerce's approach is consistent with a major purpose of BIA to permit Commerce, and not respondents to control antidumping investigations. See Allied-Signal, 996 F.2d at 1191 (quoting Olympic Adhesives, Inc. v. United States, 899 F.2d 1565, 1571 (Fed. Cir. 1990)("We agree that [Commerce] cannot be left merely to the largesse of the parties at their discretion to supply the [Department] with information. This is particularly the case when [Commerce] is attempting to obtain information to conduct statutorily mandated administrative reviews because unlike [the International Trade Commission], the [Department] has no subpoena power.")). Indeed, to accept Plaintiff's arguments "would be tantamount to allowing a beneficial post-hoc correction of Santa Helena's response." Remand Determination at 17. Finally, Commerce's choice of partial BIA is not punitive because the agency did not reject low margin information in favor of high margin

information that was demonstrably less probative of current conditions.  See Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1190 (Fed. Cir. 1990).

Plaintiff also challenges Commerce's use of an inflation adjustment, arguing that the Department erred in adjusting Santa Helena's currently incurred preproduction expenses. Pl.'s Comments at 30.  Plaintiff contends that the Department's practice is to only adjust assets for inflation.  Id. at 31.  Therefore, Commerce erred in adjusting Santa Helena's preproduction expenses.

Plaintiff is correct to the extent that Commerce does not make inflation adjustments to current expenses.[14]  Thus, for those respondents that reported preproduction expenses on a current basis, no inflation adjustments were made to these expenses.  See e.g., C.R. Doc. No. 928 (Florcol Group Response to June 1995 Supplemental Questionnaire, July 18, 1995) at 2; C.R. Doc. No. 932 (Agricola Acevedo Ltda. Response to June 1995 Supplemental Questionnaire, July 19, 1995) at 2.  However, this is not the case here.  Plaintiff reported its preproduction expenses using the crop adjustment methodology.[15]  Plaintiff also argues that if inflation

_____

[14]Under Commerce's own inflation methodology, and consistent with Colombian GAAP, no inflation adjustment is made to current expenses because they are expressed in current value pesos. However, when a respondent uses the crop adjustment method, Commerce consistently makes inflation adjustments to amortized preproduction costs.  See infra n.15.

[15]In its June 1995 supplemental questionnaire, Commerce directed respondents as follows:

If you have amortized preproduction costs in tables 2A, 2B, or 2C  and or depreciation expenses in Table 2D

adjustments are appropriate, the Department erred in its calculations of the inflationary factor. Pl.'s Comments at 32. First, Plaintiff maintains that Commerce's approach was not in accordance with law because it is "inconsistent with Commerce's BIA policy, applied to other respondents in these reviews and previously affirmed by this court, concerning how to make inflation adjustments for respondents that failed to report, or incorrectly reported, inflation adjustments." Id. Plaintiff contends that Commerce should have used the inflation adjustment factors that it calculated and applied to other non-responsive respondents as partial BIA.[16] Id. Plaintiff cites to Cultivos Miramonte S.A. v. United States, 22 CIT __, 7 F. Supp.2d 989 (1998), to support this position. Pl.'s Comments at 33.

Plaintiff claims that Commerce's use of a different BIA

---

which are based on historical asset values which, revise these expenses so that they are based on asset values which, in accordance with Colombian GAAP, have been adjusted to reflect the effects of inflation and submit new diskettes.

June 22, 1995 Supplemental Questionnaire, P.R. Doc. No. 1508.

[16]In its memorandum dated February 20, 1996, Commerce's Office of Accounting examined the monthly inflation rates in Colombia during the relevant time periods and devised inflation adjustment factors to be used as partial BIA in cases in which respondents failed to correctly report inflation adjustments as instructed in the June 1995 supplemental questionnaire. P.R. Doc. No. 1721 (Memo to Richard Rimlinger from Michael Martin Re: Inflation Adjustments to Depreciation and Amortization Costs, Feb. 20, 1996) at 1. Separate factors were calculated for each period of review, for depreciation expense adjustments and preproduction amortization adjustments. Id. Commerce applied these inflation adjustment factors to the reported amortized preproduction expenses computed by respondents that failed to make inflation adjustments. Final Results, 61 Fed. Reg. 42,844-45.

inflation adjustment for Santa Helena represents a departure from established agency practice regarding the determination of partial BIA for parties that failed to report, or incorrectly reported, inflation adjustments.  Id. at 33.  Therefore, Plaintiff contends that the Department is required to provide a "reasoned basis for departing from its use of the inflation factors it itself calculated for use as BIA."  Id.  This argument reflects a basic misunderstanding of the nature of Commerce's "BIA policy."

First, Commerce has broad discretion in determining what information to use once it establishes that the application of BIA is appropriate.  See Emerson Power Transmission Corp. 19 CIT at 1159, 903 F. Supp. at 53.  Indeed, Congress granted to Commerce the discretion to tailor its application of BIA to the unique facts of each proceeding.  Accord Allied-Signal, 28 F.3d at 1191.

Second, Commerce's use of a particular BIA methodology for certain respondents during a period of review does not rise to the level of an agency practice or regulation having the force and effect of law but is rather a fact-specific determination in this case.  Cf. Motor Vehicle Mfrs. Ass'n of the United States, 463 U.S. 29, 42-43 (1983) (finding that the agency's decision to revoke an existing regulation promulgated under the rule-making procedures of the Administrative Procedure Act, is void as arbitrary and capricious in the absence of a reasoned explanation for the revocation); Cultivos Miramonte S.A. v. United States, 21 CIT __, __, 980 F. Supp. 1268, 1274-76 (1997)(finding that when Commerce treated a respondent a particular way in two prior administrative

reviews Commerce must explain the basis for its subsequent change in treatment); Shikoku Chems. Corp. v. United States, 16 CIT 382, 795 F. Supp. 417 (1992)(holding that it was unreasonable for Commerce to alter a methodology used in the original less than fair value investigation and four annual administrative reviews, where the fact pattern remained unchanged and the error discovered in the methodology was of little significance).

Moreover, Plaintiff's reliance upon Cultivos Miramonte is misplaced. Plaintiff reads Cultivos too broadly. The limited issue before the Court in Cultivos was whether Commerce's partial BIA choice to apply four-month inflation adjustments to Cultivos Miramonte's production expenses was reasonable. 22 CIT at __, 7 F. Supp.2d at 994. Commerce's specific treatment of Cultivos Miramonte, an unrelated respondent, has no bearing upon the case presently before this Court. See Nation Ford Chem. Corp. v. United States, 21 CIT __, 985 F. Supp. 133 (1997)(stating that findings in past determinations, while often relevant, are not binding in subsequent cases), aff'd, Nos. 98-1253, 98-1254 (Fed. Cir. Feb. 2, 1999).

Third, Santa Helena is different than the other non-responsive respondents because Santa Helena failed to report correctly the underlying data. The other respondents simply failed to report their inflation adjustments. Therefore, it was reasonable for Commerce to use a different BIA inflation adjustment for Santa Helena.

Plaintiff also argues that Commerce's actions are not in accordance with law because Commerce departed from using highly probative inflation factors (calculated using the actual Colombian inflation rates), to a demonstrably less probative calculation based upon meaningless ratios calculated for another company. Pl.'s Comments at 33.

Commerce adjusted information submitted by Santa Helena using actual inflation data reported in the instant investigation by the related sub-group Florex. Redetermination Memo at 2. Commerce's choice under the circumstances is not unreasonable.

That Commerce could have chosen information that would have resulted in a lower rate does not necessarily mean that the information selected was "less probative." The data reported by Santa Helena was not verified, so there is nothing on the record that would suggest that any of the information Commerce could have used was more or less probative of Santa Helena's actual inflation adjustments. Rather, what Plaintiff points to, are the different results of applying Commerce's inflation rates based on the formula it used for some respondents and the rates assigned to Santa Helena based on the Florex sub-group's data. Pl.'s Comments at 34. However, "[t]he best information 'is not necessarily accurate information, it is information which becomes useable because a respondent has failed to provide accurate information.'" Krupp Stahl A.G. v. United States, 17 CIT 450, 453, 822 F. Supp. 789, 792 (1993)(quoting Asociacion Colombiana de Exportadores de Flores v.

United States, 13 CIT at 28, 704 F. Supp. 1114 at 1126).

Plaintiff also contends that the Department's approach is not supported by substantial evidence because the Florex sub-group made mistakes in reporting its inflation adjustments. Pl.'s Comments at 35. Specifically, Plaintiff argues that Florex did not follow Commerce's instructions in using the crop adjustment methodology in its original July 1994 questionnaire response.[17] Plaintiff maintains, therefore, Commerce erred in estimating the inflation effects experienced by Florex. Id. at 36.

Defendant counters "the record does not support Asocolflores' assertion that Florex calculated its inflationary adjustments based on [two crop adjustment fields]. Rather, Florex reported only the affected lines and the amount of the increase in each line. In addition, Florex did not disclose its methodology of calculating these amounts." Remand Determination at 19.

The Court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Arkansas-Best Freight System, 419 U.S. 281, 286 (1974).

---

[17]In Asociacion Colombiana, 22 CIT at __, 6 Supp.2d 865 at 891, the Court rejected Plaintiff's argument that Commerce's instructions in its original questionnaire pertaining to the crop adjustment methodology "were unclear and inadequate." Here, Plaintiff contends the Florex sub-group correctly used the crop adjustment methodology because "Florex recognized that Commerce's instructions . . . were wrong, which affected the way in which it reported preproduction costs." Pl.'s Comments at 35 n.52. That is, Florex used only two of the three crop adjustment fields. Id. Florex reported expenses carried into the period from prior years and current expenses. C.R. Doc. No. 446 (Florex Section C & D Response, July 29, 1994) at 49-52. Florex did not, however, report expenses carried forward into the future. Id.

However, "the agency must examine the relevant data and articulate a satisfactory explanation for its action . . . ." Motor Vehicle Manuf. Ass'n. of U.S. v. State Farm Mutual Auto. Ins. Comp., 463 U.S. 29, 43 (1983).  Here, as Commerce admits, the record does not disclose the specific methodology used to derive the inflation adjustments used as BIA.  Thus, the Court cannot adequately review whether Commerce's determination is supported by substantial evidence.  Accordingly, the Court remands this issue for reconsideration.  Upon remand, Commerce must address Plaintiff's argument with respect to the accuracy of the inflation adjustments relied upon.

### 4.   Company-Specific Margin for Flor Colombia

In the Final Results, Commerce failed to list a company-specific rate for Flor Colombia in its margin tables as prescribed by section 1675(a).  See 19 U.S.C. § 1675(a)(1988).  Because these tables are used to prepare the cash deposit instructions issued to the U.S. Department of Customs, a company-specific cash-deposit rate for Flor Colombia was omitted from Commerce's instructions to Customs.  Thus, the Court remanded this issue to Commerce for reconsideration.  See Asociacion Colombiana, 22 CIT at __, 6 F. Supp.2d at 906.

Upon remand, Commerce explains "[w]hen a final and conclusive judgment is issued in these reviews, we will publish a notice of amended final results in the Federal Register.  At that time we will issue cash deposit assessment instructions to Customs to collect cash deposits and duties for Flor Colombia at the

appropriate rate (i.e., 62.79 percent)." Remand Determination at 19-20. No party challenges this correction. Therefore, Commerce's publication of a company-specific rate, in accordance with this Court's order in the underlying opinion, is affirmed.

### Conclusion

In accordance with the foregoing, it is hereby **ORDERED** that Commerce's Final Results of Redetermination is remanded for Commerce to reconsider its treatment of imputed credit expenses in accord with the Court's opinion; and it is further **ORDERED** that the issue of U.S. selling expenses is remanded for further consideration in accord with the Court's opinion; and it is further ORDERED that the issue of Commerce's choice of inflation adjustments as BIA is remanded for further consideration in accord with the Court's opinion; and it is further **ORDERED** that remand results are due on **May 3, 1999**; comments and responses are due on **June 4, 1999**; any rebuttal comments are due on **June 18, 1999**.

_____

Judge, Donald C. Pogue

Dated:    March 16, 1999
          New York, New York